BURKE, Judge.
Justin Shawn Miller appeals his convictions for first-degree robbery, a violation of § 13A-8-41, Ala. Code 1975, and conspiracy to commit first-degree robbery, a violation of § 13A-4-3(a), Ala. Code 1975, and his resulting sentences of 20 years' imprisonment and 10 years' imprisonment, respectively. Miller was also ordered to pay a $100 fine, a $100 Alabama Crime Victims' Compensation Assessment, an undefined restitution amount, and court costs in each case.
On December 19, 2014, the Baldwin County grand jury indicted Miller on one count of first-degree robbery and one count of conspiracy to commit first-degree robbery of the Courtyard Marriott Hotel in Gulf Shores. Trial proceedings began on October 18, 2016, before Judge Braxton Kittrell, Jr. The following evidence was presented at trial:
Emily Hunter Lee, Miller's former coworker at the Marriott, testified that she had been in contact with Miller approximately six weeks before the robbery of the Marriott. At that time, Lee and Miller discussed how easy it would be to steal liquor from a hotel liquor closet because they had the employee code and there were no security cameras near that area. Lee testified that she did not think it was a serious conversation and that she was "completely joking" about stealing the liquor. (Supp. R. 12.)
Lynn Stiebe, a general manager at the Marriott at the time of the incident, testified that she had previously hired Miller to work the front desk at the Marriott. On one occasion, Miller brought his gun to the hotel in his backpack and showed it to several employees. Stiebe later terminated Miller's employment because he failed to show up for several consecutive shifts.
Deborah Morris, an employee at the Marriott, testified that in the early morning hours of July 22, 2014, she was working the desk at the Marriott when a man appeared suddenly. Morris claimed that the man came from the left, which was a secured area where an "employee-entrance door" is located. (Supp. R. 35.) The employee entrance door required a code to gain access to the building. The man had a gun and demanded that Morris give him the money she had in her drawer. Morris gave the man all the money in the drawer, *909 which totaled $556.55. The man then left the Marriott through the front door.
Joshua Thomas testified that he had been staying at Miller's apartment around the time of the incident. On the night of July 21, 2014, Thomas left work between 10 and 11 p.m. As Thomas was walking back to Miller's apartment, Miller, who was driving in his Jeep sport-utility vehicle, picked Thomas up. Thomas asked Miller if Miller knew of any way for Thomas to make some money, because he was homeless. Miller told Thomas that he could take Miller's pistol and go to the Marriott and steal $600. According to Thomas, Miller told Thomas the security code to the door and explained how easy it would be to get the money from the woman who was working the desk. Miller and Thomas returned to Miller's house. Thomas got dressed in black clothing and a black hat, and put a torn up shirt over his face. Thomas stated that Miller removed the bullets from the gun and gave the gun to Thomas. Miller drove Thomas to the Marriott and showed Thomas where he would be waiting on him after the robbery. Thomas identified a video recording in which one could see Thomas and Miller sitting in Miller's white Jeep. Thomas testified that the video was taken when Miller was showing Thomas the layout of the Marriott. Miller also showed Thomas the door that Thomas would enter using the code that Miller had given Thomas, and the location of security cameras.
Thomas testified that he went in the door, took the money from an employee, and left through the front door of the lobby. Thomas stated that he then got in Miller's Jeep. Thomas claimed that he got approximately $570 from the Marriott clerk, and that he kept approximately $300. Miller also kept some of the money. Miller and Thomas returned to Miller's apartment and went to sleep. The following day, Thomas saw his face on the news and went to the Gulf Shores Police Department to turn himself in. Thoms testified that he eventually told the truth to the detectives about Miller's involvement. Thomas later pleaded guilty and was given youthful-offender status. As part of his plea agreement, he agreed to testify at Miller's trial.
Detective Brad Conway with the Gulf Shores Police Department testified that he responded to a call regarding the robbery. After talking to Morris and Stiebe, Detective Miller asked whether anyone had recently quit or been fired, because it appeared that the suspect may have had some knowledge about the Marriott based on the route the suspect took and his avoidance of security cameras. Stiebe told Detective Conway that Miller had recently been let go and, after further investigation, Miller was arrested.
Miller and his father testified on Miller's behalf. Miller claimed that he had not been involved in the robbery, and that he had actually turned Thomas in to the authorities when he saw him in the video of the robbery.
During trial, the court charged the jury on the crime of first-degree robbery. The court continued to charge the jury as follows:
"The law also provides that a person is legally accountable for the behavior of another constituting a crime if, with the intent to promote or assist the commission of the crime, he either procures, induces or causes such other person to commit the crime or aids or abets such other person in committing a crime.
"Aiding and abetting comprehends all words of assistance, encouragement, presence of constructive support ... to render assistance should it become necessary.
*910 "A person to be guilty of aiding and abetting, you must find that there was by prearrangement or on the spur of the moment the criminal events contemplated and that the person who is guilty as an aider and abettor must be present with the intent to assist should it become necessary. Does not actually assist but be there in case it becomes necessary."
(Supp. R. 213-14.) The court also charged the jury on conspiracy to commit first-degree robbery. The court instructed the jury that the defendant could be guilty of both first-degree robbery and conspiracy to commit first-degree robbery, neither of the crimes, or just one of the crimes. At the conclusion of the court's jury instructions, the court asked both parties whether the court had "overlooked anything," and both parties indicated that they were satisfied. (Supp. R. 217.) The jury then retired for deliberations. Miller asked the judge for an exception to the judge's refusal to give his requested instruction on the "uncorroborated testimony of the co-defendant." (Supp. R. 219). The judge then called the jury back to the courtroom and further instructed the jury that the defendant could not be convicted solely on the testimony of an accomplice without the presence of corroborating evidence.
After some deliberation, a spokesperson for the jury asked the judge for a "deeper explanation of the difference between the two charges, the conspiracy and then the [first-degree robbery] charge." (Supp. R. 221.) The judge reread the law on both charges, as well as aiding and abetting as it relates to the first-degree-robbery charge. The judge also confirmed to the jurors that they could find that the defendant was guilty of both or neither of the charges, or that he was guilty of one charge but not the other charge. The jury retired to deliberate again. Later, the jury returned with another question, seeking an explanation of the difference between conspiracy and aiding and abetting. After a lengthy discussion and an attempt by the judge to articulate the charges, defense counsel stated: "Judge, I think we've almost gone too far where its almost a mistrial. They're almost getting a judicial directive in the examples that are so similar to the facts at hand." (Supp. R. 237.) After more discussion, the jurors were released for the night and were told to return to continue deliberations the following day. Later that night, defense counsel filed a motion for a mistrial, arguing that under § 13A-1-8(b)(2), Ala. Code 1975, the defendant could be convicted only of either first-degree robbery or conspiracy to commit first-degree robbery, but not both.
The next day, jurors returned to continue deliberations. The record of the proceedings resumed with a substitute judge, Judge Scott Taylor, presiding over the trial because Judge Kittrell was unavailable. After hearing arguments from both parties relating to Miller's motion for a mistrial, the court noted that the motion for mistrial was untimely and found that the instructions given by Judge Kittrell were proper. The jury ultimately reached a verdict of guilty on both charges.
On appeal, Miller argues: 1) that the trial court erred by charging the jury on both conspiracy to commit first-degree robbery and on aiding and abetting a first-degree robbery; 2) that the trial court committed reversible error by incorrectly instructing the jury that it could return a verdict of guilty on both counts; and 3) that the trial court erred by failing to grant a mistrial when the jury was confused by the incorrect jury instructions.
The Alabama Supreme Court has long held:
" 'Review on appeal is restricted to questions and issues properly and timely *911 raised at trial.' Newsome v. State, 570 So.2d 703, 717 (Ala. Crim. App. 1989). 'An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.' Pate v. State, 601 So.2d 210, 213 (Ala. Crim. App. 1992).
" '[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.' McKinney v. State, 654 So.2d 95, 99 (Ala. Crim. App. 1995) (citation omitted). 'The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.' Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987). 'The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.' Ex parte Works, 640 So.2d 1056, 1058 (Ala. 1994)."
Ex parte Coulliette, 857 So.2d 793, 794-95 (Ala. 2003). The defendant must object to the failure to issue a requested jury instruction before the jury retires to deliberate in order to preserve that argument for appellate review. See Davis v. State, 747 So.2d 921, 924 (Ala. Crim. App. 1999) (holding that, to preserve an issue concerning jury instructions for appellate review, the defendant is required to object specifically to the contested charge).
In the present case, Miller did not object to the court charging the jury on both counts as charged in the indictment or the court's charge that the jury could find Miller guilty of both counts before the jury retired for deliberations. The only exception that Miller requested regarding the jury charges was sought in relation to the court's failure to give his requested instruction on the uncorroborated testimony of Thomas, the codefendant, and this objection was made after the jury initially retired for deliberations. After the jury returned to ask questions, Miller again indicated that he was satisfied by the court's instruction. It was not until the jury returned again later, mid-deliberations, that Miller objected to the court's instructions and, even then, Miller's objection was based on the ground that the court's responses to the jury questions had gone too far beyond stating the law and had become more of a "judicial directive" based on the examples the court gave to the jury. (Supp. R. 237.) Miller finally objected on the ground that the jury could not return a guilty verdict for both the first-degree-robbery charge and the conspiracy charge; however, he did not file the objection until a recess was taken for the night. Therefore, Miller's claims that the court erred in giving the jury instructions on both charges and that the court erred in instructing the jury that it could find Miller guilty of both charges were not properly preserved for appellate review.
Likewise, Miller's claim that the circuit court erred in failing to grant a mistrial was also untimely. Wilson v. State, 651 So.2d 1119, 1122 (Ala. Crim. App. 1994) ("To be timely, a motion for a mistrial must be made 'immediately after the question or questions are asked that are the grounds made the basis of the motion for the mistrial.' " (quoting Ex parte Marek, 556 So.2d 375, 379 (Ala. 1989) )). Miller indicated several times that he was satisfied with the jury instructions, and he did not raise the claim that he was entitled to a mistrial until after the jury had retired to deliberate. Therefore, his motion for a mistrial was untimely and was not properly preserved for appellate review.
*912 However, Miller argued in his written motion for a mistrial that he could not be convicted of both first-degree robbery and conspiracy to commit first-degree robbery under § 13A-1-8(b), Ala. Code 1975. We agree.
Section 13A-8-41, Ala. Code 1975, provides, in pertinent part, that "[a] person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he ... is armed with a deadly weapon or dangerous instrument." Section 13A-8-43(a)(2), Ala. Code 1975, states:
"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
"....
"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
Currently, there is no distinction between principals and accessories under Alabama law. See, e.g., Faircloth v. State, 471 So.2d 485, 489 (Ala. Crim. App. 1984), aff'd, 471 So.2d 493 (Ala. 1985) ("Alabama Code § 13A-2-23 (1975) continues the long recognized abolition of the distinction between principals and accessories in Alabama."). Section 13A-2-23, Ala. Code 1975, provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense; or
"(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
With regard to the concept of complicity, this Court has stated:
" 'The mere fact that a person witnesses a crime does not make him an accomplice.' Nelson v. State, 405 So.2d 392, 397 (Ala. Cr. App. 1980), reversed on other grounds, 405 So.2d 401 (Ala. 1981). 'The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime.' Dolvin v. State, 391 So.2d 129, 133 (Ala. Cr. App. 1979), reversed, 391 So.2d 133 (Ala. 1980). However, 'if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the jury may find the accused guilty.' Dolvin, 391 So.2d at 137. '[P]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.' 22 C.J.S. Criminal Law § 88(2)(d) (1961). Gibson v. State, 49 Ala.App. 18, 20, 268 So.2d 49 (1972).
" 'A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense: ... He aids or abets such other person to commit the offense.' Alabama Code 1975, § 13A-2-23(2). 'Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. No particular acts are necessary to make one an aider and abettor.'
*913 Scott v. State, 374 So.2d 316, 318-19 (Ala. 1979) (citations omitted). However, 'mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation.' State v. Tally, 102 Ala. 25, 68, 15 So. 722, 738 (1894).
" '[T]o be an aider or abettor when no assistance is given or word uttered, the person so charged must have been present by preconcert, special or general, or at least to the knowledge of the principal, with the intent to aid him. This view is very clearly stated by Mr. Wharton. He says: "It is not necessary, therefore, to prove that the party actually aided in the commission of the offense. If he watched for his companions in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law he was aiding and abetting." 1 Whart. Cr. Law, § 210. And the same idea is thus expressed by Mr. Stephens in his Summary of Criminal Law: "The aiding and abetting must involve some participation. Mere presence without participation will not suffice if no act whatever is done in concert, and no confidence intentionally imparted by such presence to the perpetrators." See Connaughty v. State, 1 Wis. 159 [ (1853) ]. And Mr. Bishop says: "A principal in the second degree is one who is present lending his countenance and encouragement, or otherwise aiding, while another does the act." Bish. Cr. Law, 648. And Mr. Wharton further says: "Something must be shown in the conduct of the bystander which indicates [to the perpetrator, manifestly a design to encourage, incite, or in some manner afford aid or consent to the particular act, though when the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone will be regarded as an encouragement.... The confederacy must be real.... Mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation." 1 Whart. Cr. Law, §§ 211a, 211c, 211d.' Tally, 102 Ala. at 68, 15 So. 722."
Payne v. State, 487 So.2d 256, 261-62 (Ala. Crim. App. 1986).
Section 13A-4-3(a), Ala. Code 1975, provides that "[a] person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement."
With regard to double jeopardy, this Court has explained:
"The Supreme Court of the United States has held that the Double Jeopardy Clause of the Fifth Amendment contains three protections: 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted), overruled on other grounds, Alabama v. Smith, 490 U.S. 794 (1989). See Schiro v. Farley, 510 U.S. 222, 229 (1994) (reaffirming the three protections of the Double Jeopardy Clause). 'These Protections *914 stem from the underlying premise that a defendant should not be twice tried or punished for the same offense.' Schiro, 510 U.S. at 229 (citing United States v. Wilson, 420 U.S. 332, 339 (1975). The Alabama Supreme Court has held that the Double Jeopardy Clause of Art. I § 9, of the Alabama Constitution of 1901, applies to protect only those three areas enumerated in Pearce. See Ex parte Wright, 477 So.2d 492, 493 (Ala. 1985) ; Adams v. State, 955 So.2d 1037, 1098 (Ala. Crim. App. 2003), reversed on other grounds, Ex parte Adams, 955 So.2d 1106 (Ala. 2005) (holding that Adams, who was 17 years old at the time of the offense, is not eligible for a sentence of death).
"In Blockburger v. United States, the Supreme Court of the United States enumerated the 'same elements' test for determining whether two charges constitute the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. 284 U.S. 299, 304 (1932). Under the Blockburger test, 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.' Id. (emphasis added)."
Gholston v. State, 57 So.3d 178, 184 (Ala. Crim. App. 2010).
Under the test enunciated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), Miller's convictions for first-degree robbery and conspiracy to commit first-degree robbery would not violate double-jeopardy principles because the elements of each offense are separate and distinct. Each requires proof of a factual element that the other does not. However, in Davis v. State, 262 So.3d 1275 (Ala. Crim. App. 2017), this Court recently held that, although two offenses may be considered as separate offenses under the Blockburger test, where the legislative intent indicates that a defendant should not be convicted and punished separately for the two offenses, the offenses should be treated as the same for double-jeopardy purposes. In Davis, the defendant was convicted of intentional murder and felony murder based on the underlying felony of first-degree robbery. See id. This Court stated in Davis:
"When multiple offenses are prosecuted in one trial, the Double Jeopardy Clause 'prevent[s] the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). A defendant suffers multiple punishments in violation of the Double Jeopardy Clause when he is convicted of more offenses than the legislature intended. Ball v. United States, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985). In Missouri v. Hunter, the Court noted that '[t]he opinion in Blockburger[ v. United States, 284 U.S. 299 (1932) ] stated: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.' 459 U.S. at 366. However, the Court further stated ' "[t]he Blockburger test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative *915 intent." Albernaz v. United States, supra, 450 U.S. [333] at 340 [ (1981) ] (emphasis added).' Id.
"Both crimes of which Davis was convicted constitute murder under the same statute. In this case, there was one murder of one victim under one set of circumstances. The statute commences, 'A person commits the crime of murder if he or she does any of the following'; thus indicating that the Legislature's intent was to set out alternative methods of committing murder. Moreover, the murder statute provides a single sentencing provision that applies to § 13A-6-2(a)(1) and (a)(3).
" 'The inquiry is whether the Legislature intended to permit multiple punishments. The Blockburger test is a useful tool for ascertaining legislative intent, but it is not the only tool. Other (nonexclusive) considerations relevant to determining whether the Legislature intended multiple punishments are: whether the offenses provisions are contained within the same statutory section, whether the offenses are phrased in the alternative, whether the offenses are named similarly, whether the offenses have common punishment ranges, whether the offenses have a common focus (i.e. whether the "gravamen" of the offense is the same) and whether that common focus tends to indicate a single instance of conduct, whether the elements that differ between the offenses can be considered the "same" under an imputed theory of liability which would result in the offenses being considered the same under Blockburger (i.e. a liberalized Blockburger standard utilizing imputed elements), and whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes.'
" Ervin v. State, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999).
"Felony murder and intentional murder may be considered as separate offenses under the Blockburger test because felony murder requires proof of a felony, which intentional murder does not, and intentional murder requires proof of intent, which felony murder does not. However, it is clear that the Legislature intended that both constitute murder, a single offense carrying a single sentence."
262 So.3d at 1285-86.
In the present case, the legislative intent concerning whether a defendant could be convicted of first-degree robbery and conspiracy to commit first-degree robbery based on the same conduct is clear. Section 13A-1-8(b)(2), Ala. Code 1975, states the following:
"(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"....
"(2) One offense consists of only a conspiracy or other form of preparation to commit the other."
Miller's conviction for first-degree robbery was obtained based on the theory that he aided and abetted his co-conspirator, Thomas, in the commission of the offense. Specifically, the State presented evidence indicating that Miller was the one who suggested to Thomas that Thomas take Miller's pistol and rob the Marriott. Miller helped Thomas get dressed for the robbery, gave Thomas the pistol, and drove him to the scene of the incident. Before Thomas robbed the Marriott, Miller took Thomas and showed Thomas the layout of *916 the Marriott, the entrance and route to use during the robbery, and where Miller would be waiting in the getaway car when Thomas was done. Miller told Thomas the security code to use to enter the Marriott through the employee-only entrance, which Miller obtained through his past employment with the Marriott. After Thomas completed the robbery as planned, Miller drove Thomas home. Based on the particular facts of this case, the same conduct used to prove that Miller aided and abetted Thomas in committing first-degree robbery was used to prove that Miller conspired with Thomas to commit first-degree robbery. Therefore, because one of Miller's convictions consisted of only a conspiracy to commit the other, i.e., first-degree robbery, which the Legislature clearly intended to prohibit in § 13A-1-8(b)(2), Ala. Code 1975, Miller's convictions for both first-degree robbery and the conspiracy to commit first-degree robbery are improper.
Consequently, because the conduct supporting Miller's conspiracy conviction is encompassed in Miller's first-degree-robbery conviction, this case is remanded to the circuit court to vacate Miller's conviction for conspiracy to commit first-degree robbery and its sentence of 10 years' imprisonment. Miller's conviction for first-degree robbery and the resulting sentence of 20 years' imprisonment is due to be affirmed. Due return shall be made to this Court within 42 days of the issuance of this opinion.
AFFIRMED IN PART; AND REMANDED WITH DIRECTIONS.*
Windom, P.J., and Welch, Kellum, and Joiner, JJ., concur.

Note from the reporter of decisions: On February 9, 2018, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On March 2, 2018, that court denied rehearing, without opinion. On May 11, 2018, the Supreme Court denied certiorari review, without opinion (1170548).